IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LORI ALFONSO,

                     Plaintiff,                           CV-07-1208-ST

        v.                                         OPINION AND ORDER

TRI-STAR SEARCH LLC, an Oregon limited
liability company; RUDI BELLINAZZO, an
individual; and CHAWN PETERSON, an
individual,

                     Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

      Plaintiff, Lori Alfonso ("Alfonso"), filed this lawsuit on August 14, 2007, against her

former employer, Tri-Star Search LLC ("Tri-Star"), its owner and president, Rudi Bellinazzo

("Bellinazzo"), and its vice-president, Chawn Peterson ("Peterson"). The Amended Complaint

alleges four claims: (1) unlawful retaliation under the Employee Retirement Income Security

Act ("ERISA"), 29 USC § 1140; (2) unlawful retaliation for asserting a wage claim under

ORS 652.355; (3) breach of the covenant of good faith and fair dealing; and (4) invasion of

privacy by intrusion upon seclusion.  Defendants deny all claims and have filed a counterclaim

for attorney fees.[1]

This court has jurisdiction over the ERISA claim pursuant to 28 USC § 1331 and 29 USC

§ 1132(e), and over the state-law claim pursuant to 28 USC § 1367, as all claims arise out of the

same common facts and are part of the same case or controversy.  All parties have consented to

allow a Magistrate Judge to enter final orders and judgment in this case in accordance with

FRCP 73 and 28 USC § 636(c).

Defendants have moved for summary judgment on all claims (docket #42).  For the

reasons below, that motion is granted.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

---

[1]  Defendants' motion does not address this counterclaim.

fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). In employment discrimination cases "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by the factfinder, upon a full record." *Schnidrig v. Columbia Mach.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## FACTS

### I.   Employment with Tri-Star

Tri-Star is an employment staffing and recruiting firm that secures temporary and permanent employees for client companies and jobs for individual client candidates. Bellinazzo Decl., ¶¶ 2, 3. Bellinazzo and another principal established Tri-Star in 2002; Bellinazzo became its sole owner in 2006. *Id*, ¶ 3; Bellinazzo Depo., p. 43.

Alfonso began working for Tri-Star in July 2004 as a recruiter and was paid on commission for recruiting and placing employees. Bellinazzo Decl., ¶¶ 2, 4. Before working for Tri-Star, Alfonso worked as a recruiter at a different employee staffing company with Bellinazzo. See *id*, ¶ 4; Presjack Depo., ¶¶ 1-6. Upon beginning her employment with Tri-Star, Alfonso executed an employment agreement with Tri-Star which contained non-compete

provisions effective for 18 months post-termination in a designated geographical area.

Bellinazzo Decl., ¶ 5, Ex. 1.

## II.    __Alfonso's Performance__

Alfonso was one of Tri-Star's top performers, earning over $200,000 in 2006 alone.

Bellinazzo Decl., ¶¶ 4, 6; Ryan Depo., p. 24.  Because of her excellent performance, Bellinazzo

afforded Alfonso special privileges, such as permitting her to work from home until noon and

allowing her the use of a separate, private office.  Bellinazzo Decl., ¶ 6.

Nevertheless, Tri-Star's management maintains that Alfonso was a difficult employee

who continuously stirred up trouble at Tri-Star and negatively affected employee morale.[2]

Bellinazzo noticed that over time Alfonso displayed an increasing tendency to complain about

and criticize him and the company.  *Id*, ¶ 7.  She expressed her criticism and engaged in

"cliquish" behavior which caused other employees to exhibit similar morale problems.  *Id*.  One

such employee was Marc Crowl ("Crowl"), another of Tri-Star's top producers.  Bellinazzo

heard from other employees that Alfonso and Crowl whispered to each other privately which

caused gossip about their relationship.  *Id*, ¶ 37.

Another employee influenced by Alfonso was J. R. Edera ("Edera").  Peterson

approached Edera after she noticed he was having performance issues.  Peterson Decl., ¶ 7.

Edera attributed his problem to the influence of persistently negative comments about the

company by some other unnamed employees.  *Id*; Edera Decl., ¶¶ 2, 3.  Peterson encouraged

Edera to take time off to think about whether he wanted to keep working for Tri-Star.  Peterson

Decl., ¶ 7.  Peterson took Edera's company phone and noticed that Alfonso repeatedly called

---

[2]  Although disputed, these facts are relevant to the mental state of Tri-Star's management.

Edera both during and after their meeting. *Id*. Alfonso denied talking with Edera when questioned by Peterson, but then changed her story when Peterson confronted her with the fact that she knew Alfonso had been calling his cell-phone repeatedly. *Id*. Edera later identified Alfonso and Crowl as the employees who had made negative comments about the company. *Id*.

Bellinazzo also claims that Alfonso was not a "team player" and would withhold information from her team in order to receive higher commissions from a job, rather then sharing it with others. Bellinazzo Decl., ¶ 8. She allegedly would sabotage other recruiters' placements behind their backs so she could put her own candidate into a position, again to increase her commission. *Id*. She also exceeded the scope of her authority by initiating and having high-level discussions with other companies concerning strategic company-to-company relationships without any Tri-Star manager's knowledge. *Id*, ¶ 9; Bellinazzo Depo., pp. 153-54. When a principal of one such company warned Bellinazzo of Alfonso's conduct, Bellinazzo admonished Alfonso. Bellinazzo Decl., ¶ 9.

In spring 2007, Bellinazzo claims he almost terminated Alfonso after she made sarcastic remarks about the fact that she had not been mentioned in a story about Tri-Star in a newsletter published by an organization which covered minority-owned businesses. *Id*, ¶ 10. After meeting with Alfonso about her comments, Bellinazzo decided to give her a second chance. *Id*. On another occasion, Alfonso insinuated to a receptionist that the receptionist must have been performing sexual favors for Bellinazzo in order to keep her job given her poor performance. *Id*, ¶ 11.

Alfonso expressed deep resentment of her immediate supervisor, Martin Ryan ("Ryan"), and complained to Bellinazzo about having to report to him. *Id*, ¶ 12 & Ex. 3. In an email to

Bellinazzo, she complained that she had no respect for, or trust in, Ryan.  *Id*.  The animosity was

apparently mutual as Ryan testified at his deposition that Alfonso was a "cancer in the office"

and that there were "two different offices:  When [Alfonso] was there, [and] when [Alfonso]

wasn't there."  Ryan Depo., p. 19.  He also claims that at least two employees left Tri-Star

because of Alfonso's behavior.  *Id*, p. 30.

To rebut Tri-Star's claims, Alfonso has submitted declarations of Tri-Star's other original

owner, three former Tri-Star employees, and a former co-worker of both Bellinazzo and Alfonso

at another recruiting agency.  *See* Plaintiff's Exs. 24-28.[3]  They all attest to Alfonso's exemplary

and selfless performance as an employee at Tri-Star.  According to the declarations, Alfonso was

helpful, strove never to create conflict in the workplace, was a team player and always willing to

share, was not at all cliquish, and never tried to "stir the pot."  In short, they paint exactly the

opposite picture of Alfonso's personality and conduct as portrayed by defendants.

## III.    The Plan Problem

Tri-Star sponsored an ERISA-governed savings incentive match plan for small employers

(SIMPLE) IRA Plan.  Bellinazzo Decl., ¶ 13.  Bellinazzo was the plan administrator.  *Id*.  The

Plan required Tri-Star to deduct a designated amount from a participating employee's paycheck

and deposit it into the employee's IRA.  *Id*.  As part of the Plan, Tri-Star agreed to match the

employee's contribution.  *Id*.  Only Alfonso, Bellinazzo and one other employee participated in

the Plan.  *Id*.

---

[3]All references to "Plaintiff's Ex" are to the exhibits attached to Alfonso's motion for summary judgment (docket #68).
Many of these exhibits have been properly authenticated.  Many of them are depositions which lack the reporter's certification
page.  Some of Tri-Star's exhibits suffer similar problems.  Nevertheless, this court will consider this evidence in order to
conserve judicial resources which would be expended in striking the evidence and resolving any motion for reconsideration.  *See
Orr v. Bank of Am.*, 285 F3d 764 (9th Cir 2002),

Until approximately 2005, Tri-Star handled payroll in-house.  *Id*.  In early 2006, it began

using the services of a payroll company (ADP) which handled all paychecks, payroll, taxes, and

payroll deductions.  *Id*, ¶ 13; Bellinazzo Depo., pp 49-50.

On April 10, 2007, Alfonso's financial advisor notified her that there had been no

deposits to her IRA for her 2005 and 2006 payroll deductions, even though the money had been

taken out of her paycheck.  Bellinazzo Decl., ¶¶ 14, 15 & Ex. 4, p.1.  Alfonso notified Bellinazzo

of this issue by email and in person, reporting that her advisor had indicated that this "could get

Tri-Star in a lot of trouble with ERISA."  *Id*.  Bellinazzo responded with surprise, thanked

Alfonso for bringing the problem to his attention, and said he would look into it.  *Id*; Alfonso

Depo., p. 64.

Alfonso admits the discussion was cordial and Bellinazzo did not indicate any

displeasure with bringing the problem to his attention.  Alfonso Depo., p. 64.  In an email on

April 10, 2007, she wrote:  "Thanks!  I'm sure it's a quick fix.  I don't appreciate ADP causing

Tri-Star issues.  That would make me very angry and I would have to kick some Payroll Punk-

ass . . . .  Nobody f[****] with my company . . . ."  Bellinazzo Depo., ¶ 15 & Ex. 4, p.1.

The next day in emails to her boyfriend, Alfonso expressed her concern for the effect this

issue could have on Tri-Star:  "I'm still TOTALLY FREAKING out.  I know [Bellinazzo] would

never do something like this on purpose.  I'm really concerned that one of our services screwed

over [Bellinazzo] and dropped the ball."  *Id*, p. 4 (emphasis in original).  Later she wrote again:

> If it's ADP's screw up I [*sic*] will definitely sue them for every penny.
> I'm not going to penalize [Bellinazzo].  I know he didn't do this. . . . I'm
> really worried about [Bellinazzo].  This could be bad for him.  He's a
> good person.  I hate causing him more headaches but Dave [her financial
> advisor] said I'm saving [Bellinazzo's] skin by drawing attention to it now
> because ERISA calculates fines by the day."

*Id*, p. 3.

On April 12, 2007, Alfonso notified Bellinazzo that she had calculated the total amount of withdrawals from her W-2s that should have been deposited into her account. *Id*, p. 5. The total was $22,181.70, which included both her contribution and the employer match. *Id*. She also asked Bellinazzo how to handle the two years of interest she would have earned had the money been properly deposited into her account. *Id*.

On April 13, 2007, Bellinazzo deposited all delinquent employee contributions and the employer match for 2005. *Id*, p. 6. He did not deposit the 2006 match because he understood it was not due until Tri-Star filed its 2006 tax returns. *Id*. For the 2005 match he used the 3% match rate, though he indicated to Alfonso that Tri-Star may reconsider this amount and reduce it to 1% for the 2006 match which he believed was permitted by ERISA. *Id*. Bellinazzo notified Alfonso of the actions by email and concluded by thanking Alfonso for notifying him of the problem and explaining that they had "put measures in place to prevent future issues" like this from happening. *Id*.

Bellinazzo believes that the problems with the IRA deposits was caused by a combination of the change to ADP and by the issue falling between the cracks while he was very busy. Bellinazzo Decl., ¶ 14; Bellinazzo Depo., pp. 48-50. He asserts that he was also affected by the problem as deposits were not being made into his IRA either. Bellinazzo Decl., ¶ 15. He later explained that ADP actually recorded the amounts for the deposits but did not send the money because that was not part of its responsibility under the agreement between ADP and Tri-Star. Bellinazzo Depo., p. 52.

Bellinazzo remembers having at most three cordial conversations with Alfonso about the failure to make deposits into her IRA.  He also states that he told Alfonso he would deposit additional amounts reflecting the lost earnings on Alfonso's account but needed her to get him the account performance information.  *Id*.  Because there were no further communications about the IRA after April 13, 2007, Bellinazzo believed the lost earnings was not an issue of real concern to Alfonso.  *Id*.

Alfonso admits that all the communications she had with Bellinazzo concerning her IRA were cordial and made in a sprit of "shared concern" for the sake of him and the company. Alfonso Depo., pp., 71-72, 75-77.  She did not accuse Bellinazzo of acting intentionally or threaten him with a lawsuit, and he also communicated cordially.  *Id*, pp. 71-72.  Now she believes that Bellinazzo intentionally withheld the deposits from her account and denies that Bellinazzo ever offered to pay her lost interest earnings.  *Id*, pp. 135-36.

## IV.   **Hostilities Commence**

Alfonso alleges that after she complained about the Plan, Bellinazzo began treating her "with uncharacteristic hostility."  Amended Complaint, ¶ 25.  On one occasion, Bellinazzo yelled at her for getting involved in a dispute between Crowl and another recruiter.  *Id*, pp. 103-04.  Alfonso admits, however, that Bellinazzo seemed genuinely concerned about the subject matter of the dispute.  *Id*, p. 105.

Alfonso believes she was "disinvited" from a lunch that was supposed to occur with an important client she had been handling.  However, she admits she does not know if the lunch ever took place.  *Id*, pp. 107-08.  Bellinazzo explains that this meeting was cancelled at the client's request.  Bellinazzo Decl., ¶ 34.  The client, a good friend of Bellinazzo's, instead

suggested that he and Bellinazzo meet for lunch to "catch-up" and that a more formal business meeting could occur later. *Id*. Bellinazzo, the client, and an account manager later met and the client agreed to sign a fee agreement. Bellinazzo Depo., p. 64. Bellinazzo claims that this account never produced any work for recruiters in Alfonso's division (accounting) and no recruiter was ever assigned to work it. *Id*, pp. 64-65.

Alfonso also complains Bellinazzo permitted another account manager to call one of her most important clients even though he knew that the client only wanted one point of contact at Tri-Star. Alfonso Depo., pp. 108-10. Bellinazzo denies having any knowledge of this client's preference or of any account manager calling this client, but contends that it was company policy for account managers to call clients for quality control. Bellinazzo Decl., ¶ 36.

Alfonso also was not informed about an important divisional meeting. Alfonso Depo., pp. 110-12. Bellinazzo explains that divisional meetings occurred every week, with Alfonso's meeting occurring on Mondays around 11:00 a.m., though he could not be sure of the time. Bellinazzo Depo., pp. 65-66. It was Alfonso's responsibility to show up at these regularly scheduled meetings. *Id*, p. 67. Because Alfonso worked out of the office until noon each day, they did not call her to let her know if an impromptu meeting was called in the morning. *Id*.

Also, in May 2007, Bellinazzo or Peterson instructed Alfonso not to talk to or to go to lunch with Crowl, telling them that they "were the two senior people there and the two top billers, so . . . [they] shouldn't both be gone at the same time." Alfonso Depo., pp. 114, 112-13. Bellinazzo explains that he instructed them not to have lunch together after he observed performance problems, including their taking extra long lunches together, and because he believed their working relationship had become unprofessional. Bellinazzo Decl., ¶ 37.

Finally, Alfonso asserts that she and Crowl were denied timely payment of a commission check.  Alfonso Depo., pp. 123-24.  This occurred on May 31, 2007, when she was not permitted to pick up a check held by a client that would have resulted in a commission being paid.  If the check had been picked up and deposited on that date, the commission would have been paid on June 15, 2007.  Because it was not picked up until June 1, 2007, she was not entitled to payment until June 30, 2007.  Bellinazzo responds that Alfonso still received her commission from this account on or before June 15, 2007.  Bellinazzo Decl., ¶ 39.

Alfonso believed that these hostilities were related to her complaints about her IRA and concluded that "had I made any action whatsoever regarding my employment or my retirement plan, I would have been terminated."  Alfonso Depo., p. 120.

## V.    **Termination**

On June 5, 2007, Bellinazzo arrived at the office and noticed Crowl in the parking lot preparing to leave.  Bellinazzo Decl., ¶ 17.  Crowl informed Bellinazzo that he had a meeting with his attorney.  *Id*; Crowl Depo., p. 26.  At the time, Bellinazzo was aware that Crowl was having tax issues including a tax garnishment which was being withheld from his paycheck, and was aware that he had been working with a tax attorney.  Bellinazzo Decl., ¶ 17; Crowl Depo., pp. 45-46.  Bellinazzo told Crowl he needed to get back to the office as soon as possible.  Crowl Depo., pp. 27-28.  After leaving, Crowl met with his tax attorney and then, along with Alfonso, met with an employment lawyer.  *Id*, p. 29.

When Bellinazzo came into the office, he learned that Crowl had been in a dispute with his supervisor, Ryan, in the lobby of the office the prior morning and that Ryan had reprimanded him.  Bellinazzo Decl., ¶ 18.  Bellinazzo intended to discuss the incident with Crowl when he

returned to the office.  *Id*.  Several hours later, Bellinazzo learned that he had still not returned. *Id*.

Bellinazzo also learned that Alfonso had marked herself out on her Outlook calender that day at 12:30 p.m. to meet with Phil Smith.  *Id*.  Because Phil Smith was a competitor, Bellinazzo was concerned that Alfonso was having company-to-company level discussions or negotiations outside the scope of her duties again, despite his earlier admonitions.  *Id* & ¶ 9.  Concerned that he had two employees out who were not working, or were working on non-approved business, Bellinazzo had Ryan call both Crowl and Alfonso to tell them to come into the office.  *Id*.  Crowl and Alfonso received these calls in short succession while they were jointly meeting with their employment attorney.  Alfonso Depo., pp. 89-90; Crowl Depo., p. 31.

When Crowl returned, Bellinazzo called him into a meeting along with Peterson and Ryan.  Bellinazzo Decl., ¶ 23.  According to Bellinazzo, as with Alfonso, there had been numerous problems with Crowl concerning his performance, professionalism, and insubordination.  *Id*.  Bellinazzo discussed these issues with Crowl and asked him to explain why he should be retained at Tri-Star.  *Id*.  According to Bellinazzo, Crowl launched into a loud and profanity-laced tirade against the company.  *Id*.  Bellinazzo fired him, and Crowl stormed out of the office.  *Id*.

Bellinazzo next called Alfonso into his office.  *Id*, ¶ 24.  Unbeknownst to Alfonso, Bellinazzo, Peterson, and Ryan had called Edera in earlier to ask him to identify which employees had been criticizing the company.  Peterson Decl., ¶ 12.  Edera identified Alfonso and Crowl, among others, and also claimed that Alfonso had tried to recruit him away from Tri-Star, stating the he was "too good for Tri-Star" and had no future with the company.  *Id*; Bellinazzo

Decl., ¶ 24; Edera Decl., ¶¶ 3, 4.  According to Bellinazzo, this was the "'last straw'" for an employee with a long history of problems, and whose relative economic contribution in a now larger company was not so critical that the company could afford to continue rationalizing her continued tenure."  Bellinazzo Decl., ¶ 24.

Alfonso, in contrast, asserts that Edera asked *her* to leave Tri-Star, start her own company, and hire him.  Alfonso Decl., ¶ 9.  However, she admits she told Edera that she could help find him another job because he had told her he was unhappy at Tri-Star.  Alfonso Depo., p. 127.

At the meeting, Bellinazzo and Peterson questioned Alfonso about Edera's accusations. Peterson Decl., ¶¶ 12, 13; Bellinazzo Decl., ¶ 25.  Alfonso denied saying anything to Edera or attempting to recruit him away.  *Id.*  Bellinazzo then fired her.  *Id.*  Alfonso admits that Bellinazzo told her she was fired for disloyalty and that the subject of Edera came up, but also believes they discussed other issues.  Alfonso Depo., p. 126.

Within a few minutes after leaving the meeting, Alfonso sent the text message "Thanks J.R." to Edera's cell-phone which was still in Peterson's possession.  Peterson Decl., ¶ 14.  Edera claims that he later received a threatening text from Alfonso saying that he would never work in Portland again.  Edera Decl., ¶ 4.  Alfonso denies sending a threatening message and claims that the "Thanks J.R." message was intended to express her disappointment at his dishonesty in telling Bellinazzo that she had tried to recruit him away from the company.  Alfonso Depo., pp. 129-30.

///

///

## VI.   <u>The Emails</u>

Alfonso contends that Bellinazzo fired her because she met with an attorney about

possible claims related to Tri-Start's ERISA violations.  She believes that Bellinazzo learned

about this meeting by reading her personal Hotmail email account containing three emails

between her, Crowl, and her attorney setting up a time to meet.  One email from Alfonso to the

attorney sent June 1, 2007, read, in part:

> My co-worker, Marc Crowl, and I would like to leave our current
> employer but we have non-compete agreements.  Our employer has
> broken several Labor Laws so we were hoping we could use that to our
> advantage.  Things are very uncomfortable at work.  They read all of our
> e-mails and monitor our appointments.  The owner is extremely paranoid
> and abusive.

Plaintiff's Ex. 13.

The second email is an exchange between Alfonso and her accountant about records

needed for the meeting.  Plaintiff's Ex. 14.  The third email is an exchange between Crowl and

Alfonso about the meeting.  Plaintiff's Ex. 15.

Bellinazzo, Peterson, and Ryan all deny reading these emails or knowing that Alfonso

and Crowl were meeting with an employment attorney on the day they were both were fired.

All Tri-Star employees were informed orally and in writing that the emails and calendar

entries generated or received on their office Outlook accounts were accessible to management.

Bellinazzo Decl., ¶ 29.  Those with administrator status, Bellinazzo and Peterson, could log in to

a central server to access each employees Outlook email and calendar accounts.  *Id*.

Allegedly out of a concern for the confidentiality of company intellectual property,

Bellinazzo worked with an outside technology consultant to install a spyware program called

Personal Inspector.  *Id*, ¶ 30.  This program could record keystrokes or screenshots of a target

computer and then send this information to a designated recipient.  The technology consultant

installed the program and briefly trained Bellinazzo how to use it.  E. Crowl Depo., pp. 21-22.

Both Bellinazzo and Peterson deny ever using this program after initial tests failed to produce

any useful information.  Bellinazzo Decl., ¶ 32; Peterson Decl., ¶ 16.

<u>**DISCUSSION**</u>

**I.**     <u>**ERISA Retaliation (First Claim)**</u>

The First Claim alleges that Tri-Star and Bellinazzo terminated Alfonso for exercising a

protected right when she requested that they deposit her contributions to her Plan account and

make employer matching contributions as required by the Plan.

**A.**     <u>**Legal Standards**</u>

Under ERISA it is unlawful for employers to "discharge, fine, suspend, expel, discipline,

or discriminate against a participant or beneficiary for exercising any right to which he is entitled

under the provisions of an employee benefit plan" or any ERISA right.  29 USC § 1140

("§ 510").  The parties agree that the Plan offered by Tri-Star was an employee benefit plan

subject to ERISA's anti-retaliation provision.

To establish a § 510 claim, Alfonso must prove that her exercise of a right protected by

ERISA was a "motivating force" behind her termination.  *Kimbro v. Atl. Richfield Co.*, 889 F2d

869, 881 (9th Cir 1989), *cert denied*, 498 US 814 (1990).  The "purpose of section 510 is to

'prevent persons and entities from taking actions which might cut off or interfere with a

participant's ability to collect present or future benefits or which punish a participant for

exercising his or her rights under an employee benefit plan.'"  *Lessard v. Applied Risk Mgmt.*,

307 F3d 1020, 1024 (9th Cir 2002), quoting *Tolle v. Carroll Touch, Inc.*, 977 F2d 1129, 1134 (7th Cir 1992).

To analyze § 510 violations, courts have adopted the burden-shifting analysis common to other types of retaliation claims. *See Ritter v. Hughes Aircraft Co.*, 58 F3d 454, 457 (9th Cir 1995). Thus, Alfonso may establish a *prima facie* case of retaliation by showing: (1) she participated in a statutorily protected activity; (2) Tri-Star took an adverse employment action against her; and (3) a causal connection exists between the two. *Kimbro*, 889 F2d at 881 (citation omitted).

Once she establishes a *prima facie* case, the burden shifts to Tri-Star to articulate a legitimate nondiscriminatory reason for its decision to terminate her. *Ritter*, 58 F3d at 456-57. If it is able to do so, the burden shifts back to Alfonso to prove that its proffered justification is actually pretext for its true motive of retaliation; this inquiry merges with Alfonso's ultimate burden to demonstrate a genuine issue of fact that Tri-Star's motivation in terminating her was retaliation for her exercise of protected rights. *Id*.

**B.    Prima Facie Case**

**1.    Protected Activity**

Tri-Star does not dispute that Alfonso engaged in protected conduct by complaining about missing funds in an ERISA-protected IRA and meeting with an attorney to discuss options to address an employer's alleged ERISA violations.

**2.    Adverse Employment Action**

An adverse employment action is "one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F3d 1080, 1089 (9th

Cir 2008) (alterations in original), quoting *Chuang v. Univ. of Cal. Davis*, 225 F3d 1115, 1126 (9th Cir 2000).  The Ninth Circuit has adopted a very broad definition of adverse employment actions for retaliation claims:  "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."  *Ray v. Henderson*, 349 F3d 634, 646 (9th Cir 2003).

There is no dispute that termination is an adverse employment action.  However, Alfonso alleges that she also was subjected to the following adverse employment actions after complaining about her account:  (1) Bellinazzo yelled at her for getting involved in a dispute between coworkers; (2) she was "disinvited" from an important client lunch; (3) Bellinazzo permitted an account manager to call one of her best clients; (4) she was not informed about an important divisional meeting on one occasion; (5) Bellinazzo instructed her not to go to lunch with Crowl; and (6) a commission was not timely paid.

The second of these acts rises to the level of an adverse employment action.  Given that Alfonso was paid entirely on commission, being denied the opportunity to lunch with an important client who could provide a source of income could deter a reasonable person from engaging in protected conduct.

However, the remaining acts must be disregarded.  Having a boss yell at an employee once on a subject matter entirely unrelated to protected conduct would not deter a reasonable employee from engaging in protected conduct.  The same is true of having an important client – who in fact was a client of the company – contacted on one occasion by an account manager conducting quality control.  No reasonable employee would be deterred by not being informed of one meeting, particularly here when each division held weekly meetings.  Instructing an

employee not to go to lunch with a coworker due to a suspected unprofessional relationship is within the normal prerogative of an employer. Finally, with respect to the commission check, the evidence reveals that Alfonso actually received it on time after it was picked up, and a one day delay in picking up one check cannot be considered sufficiently adverse to support a claim for retaliation.

### 3.    Causation

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted). "[A] prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F2d 1371, 1376 (9th Cir 1987). The showing required to meet this burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen*, 686 F2d at 796.

Given the close proximity in time between the protected conduct and the two adverse employment actions, coupled with the fact that Alfonso was one of the top employees who had manifested some behavior problems in the past with no adverse consequences, there is a sufficient causal link to satisfy the very minimal burden required at the *prima facie* stage.

### C.    Legitimate Justification

Since Alfonso has established a *prima facie* case, the burden switches to Tri-Star to articulate a legitimate non-retaliatory reason for the adverse action. *Id*. It "need not prove the

absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff." *Id* (citations omitted). This is merely a burden of production as the ultimate burden of persuasion remains with Alfonso at all times. *Id* at 796-97.

With respect to the client meeting, Tri-Star has proffered Bellinazzo's explanation that the meeting was cancelled by the potential client. When he later met the client (a friend) for lunch, Bellinazzo took along an account manager (who had also been slated to come to the first meeting), but did not take along another recruiter or ever assign the account to another recruiter. This explanation satisfies Tri-Star's burden.

As to Alfonso's termination, Tri-Star also meets its burden. Bellinazzo has provided a legitimate non-discriminatory reason for terminating Alfonso, namely, for disloyalty after it came to light that she had soured the morale of Edera and attempted to recruit him to another company. This occurred in the context of several other perceived performance issues.

**D.    Pretext**

Once Tri-Star asserts a legitimate justification for the adverse actions, Alfonso must show that the justifications are mere pretext and that discriminatory animus actually motivated the actions. Alfonso may do this either through direct or circumstantial evidence. *Coghlan v. Am. Seafoods Co.*, 413 F3d 1090, 1094-95 (9th Cir 2005). Also, an employee may show pretext "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Chuang*, 225 F3d at 1124, quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 US 248, 256 (1981).

///

1.      **Client Meeting**

Alfonso has failed to offer any proof that contradicts or casts doubt on Bellinazzo's

explanation of why he did not include her in the meeting with the client.  There is absolutely no

evidence, other than the close proximity in time, that would persuade a reasonable juror that his

actual intentions were to discriminate against Alfonso because she had complained about her

ERISA account.  Indeed, all the remaining evidence points in the other direction.  As noted

above, Bellinazzo quickly deposited the missing funds to Alfonso's account and gave every

indication he was thankful that Alfonso had notified him of the problem as the error affected his

account, too.  While Alfonso denies that Bellinazzo ever offered to repay her lost interest, she

never expressed dissatisfaction with his actions on April 13, 2007, to restore the amount owed to

her account.  All communications between Alfonso, Bellinazzo and others during this time

period show that she did not blame Bellinazzo or think he withheld her money intentionally.

There is no evidence that Bellinazzo ever expressed a negative reaction to Alfonso's actions in

notifying him about the problems with her IRA.

Even adding the other incidents of alleged hostility into the mix, nothing indicates

Bellinazzo operated with a retaliatory intent.  He did not assign to any other recruiter the client

whom Alfonso was unable to meet, and there is no evidence that the client's account ever

produced a single dollar of commission for any recruiter in Alfonso's department.  Also, during

the same time period when Alfonso allegedly was being subjected to hostile treatment, Tri-Star

continued to treat her favorably.  For example, in May 2007, Alfonso was among only a handful

of employees invited to participate in a breakfast and awards ceremony sponsored by the

Portland Business Alliance at which Tri-Star was given an award.  Bellinazzo Decl., ¶ 38.  That

same month, Alfonso was treated to an expensive dinner at a nice restaurant with Peterson and

Bellinazzo for which Peterson paid. *Id*. In addition, Alfonso continued working her favorable

schedule and had no other material changes to her employment relationship with Tri-Star.

### 2.    Termination

This analysis applies with equal force to Alfonso's termination. The minor instances of

perceived mistreatment listed by Alfonso do not suffice to establish a genuine issue of fact that

her later termination was more likely motivated by a desire to retaliate for Alfonso's complaints

about the deposits missing from her IRA. If this were Alfonso's only argument, the analysis

would end.

However, Alfonso also points out that her termination occurred on the same day that she

and Crowl met with their employment attorney to discuss Tri-Star's violations of "labor laws."

She argues that this coincidence provides convincing evidence that the true reason for her

termination was her attempt to enforce her rights under ERISA. Of course, in order for the

inference to arise, she must prove that one of Tri-Star's managers actually knew of her meeting

with the attorney. This, she claims, they learned by reading her personal email.

Assuming for the moment that the emails between Alfonso, Crowl, and her attorney

suffice to show that Tri-Star's alleged ERISA violations were a topic of discussion at their

meeting (a point vigorously contested by Tri-Star), Alfonso must still demonstrate that someone

at Tri-Star read them. All of the managers at issue have affirmatively denied doing so, and

Alfonso has no direct proof that they did. Alfonso attempts to create an issue of fact through

circumstantial evidence, noting that, if operational, the spyware program (Personal Inspector)

would have given Bellinazzo the ability to copy keystrokes or look at screen-shots captured from

her computer.  Additionally, even if Bellinazzo did not obtain her information in this manner,

Alfonso believes she kept her password in one of her Outlook contacts to which he admittedly

had access.[4]

Defendants contend that no Tri-Star manager read Alfonso's emails.  To prove their

innocence, defendants employed the services of a computer forensics expert, Justin McAnn

("McAnn"), to analyze the hard drives of the work computers used by Alfonso, Crowl,

Bellinazzo, Peterson, and Ryan, as well as the hard drive of Peterson's home computer.[5]  McAnn

was asked to determine what, if any, information could be gleaned about the spyware allegedly

loaded on Alfonso's computer or whether there was any evidence that any of Tri-Star's

managers looked at Alfonso's personal email.[6]  McAnn Decl., ¶¶ 4, 5.

McAnn extensively and exhaustively explains the operation of the Personal Inspector

program and the evidence he should find if it is used to access a "target machine" or the

computer from which information is taken.  A simplified explanation of how Personal Inspector

works is as follows:  The program is loaded onto a target machine.  This target machine can then

be configured to record any keystrokes sent from the keyboard, along with any applications run

or internet sites visited.  *Id*, ¶ 6.  All of this information is then sent periodically to an email

---

[4] Alfonso has no evidence, and has not argued, that Tri-Star could have found out about her meeting with Crowl and the attorney other than through her personal email.  Both Alfonso and Crowl have denied telling anyone at Tri-Star of their meeting, and there is no evidence that any one else knew.  Thus, Bellinazzo, Peterson, or Ryan must have learned of the meeting through Alfonso's personal email or not at all.

[5] McAnn's credentials are impressive, and he is clearly qualified to render an expert opinion on these issues.  *See* FRE 702; McAnn Decl., ¶ 2 & Ex. 1 (recounting extensive training and experience as a digital forensic examiner and certification as a security professional with over 12 years of experience working on computers and networks including administration, intrusions, and forensic examination on hundreds of systems).

[6] More accurately, McAnn analyzed "forensic images," or copies, of each of hard drive created by computer and digital evidence examiners Vernon Schroder and Chris Kitto.  McAnn Decl., ¶ 4; Schroder Decl., ¶ 4; Kitto Decl., ¶ 2.  A forensic image is an exact copy, or bit-stream-image, of the hard drives.  Shroder Decl., ¶ 5; Kitto Decl., ¶ 3.  These declarations, along with that of Tri-Star's technology consultant, Allan Dassonville, establish a chain of custody over the information stored on the hard drives from the moment they were delivered to them for analysis.

address ("server") designated by the person installing the program for consolidation. *Id*. Importantly, all of this "sent" data continues to remain on the target machine and creates other records on the target machine. McAnn Supp. Decl., ¶ 10. Also saved on the target machine are any screen shots taken by the program. All of this information can be found through forensic analysis even if deleted. *Id*. These files are sent to the email address and can then be viewed by remote users with administrative permission over a network or interactively on another computer. McAnn Decl., ¶ 6. The copies of the files sent to the server also are saved and are viewable even if deleted. *Id*.

From his analysis of Alfonso's hard drive, McAnn was able to conclude that Personal Inspector was loaded onto Alfonso's computer on April 2, 2006. *Id*, ¶ 8. His analysis also showed that Personal Inspector was deleted by Alfonso's anti-virus software the next day and was never operational after that. *Id*, ¶¶ 8-11. There was no evidence that the Personal Inspector program ever copied a single key stroke or saved a single screen shot. *Id*.

McAnn's analysis of the other computers revealed that the Personal Inspector program operated longer on Ryan's computer, but also was deleted on November 6, 2006. *Id*, ¶ 13. McAnn conducted the same analysis on the computers used by Crowl, Bellinazzo, and Peterson computers, all with the result of not finding the Personal Inspector program operational on any of their hard drives. *Id*.

In short, the Personal Inspector program was operational for only one day on Alfonso's computer over one year before the emails at issue in this case were sent. Thus, it could not have been used to access her email account in late May and early June 2007. Moreover, if Personal Inspector had ever been used to capture Alfonso's password, it would have been discoverable

from McAnn's examination of Alfonso's computer even after deletion of the program. *Id*, ¶ 16. McAnn discovered no such evidence. *Id*.

McAnn continued his analysis by seeking any possible indication that Alfonso's Hotmail password was stored in her computer or used on any of the other computers. His examination revealed that Alfonso saved this password in her contacts lists, but under a "Vonage" account contact, not under a Hotmail entry. He also could find no evidence of her password or information from her Hotmail account on the other employee hard drives he examined. *Id*, ¶ 14.[7]

As proof of the validity of his methods, and as proof that relevant data had not been overwritten, McAnn was able to find two of the three emails at issue (the one to her attorney and the one to her accountant) still stored in temporary internet files on Alfonso's hard drive. *Id*, ¶ 15; McAnn Supp. Decl., ¶12. He located the final email on Crowl's hard drive, but not on Alfonso's hard drive, leading him to believe that Alfonso had used a different computer than her work computer in communicating with Crowl about the meeting. *Id*. McAnn states that finding these emails on Alfonso's hard drive demonstrates that had these emails been viewed using her password or by any other method on another computer, he also would have found them on that computer. Instead, he found the emails only on the computers used by Alfonso and Crowl, making them the only two individuals for whom there is evidence that they had access to the emails. McAnn Decl., ¶ 17.

///

///

---

[7] Tri-Star's current technology consultant performed similar keyword searches on the Tri-Star server that holds the Tri-Star employees' Outlook data. He found no contact information containing that password, "LinkedIn," "Hotmail," or "password." Dassonville Decl., ¶ 5.

Finally, McAnn looked for any evidence of "disk wiping" software that can be used to overwrite data and found no evidence that it had been loaded onto any of the computers he examined. *Id*, ¶ 14. He indicates that it is highly unlikely that any of the relevant data could have been overwritten in the eight days between Alfonso's termination and when she turned in her computer. *Id*. Data is overwritten only as it fills up the hard drive, and Alfonso's hard drive was still over 87% empty. *Id*.

This evidence provides conclusive proof that Bellinazzo, Peterson, and Ryan did not use Personal Inspector to capture Alfonso's email password or read screen shots of her emails. It also establishes that none of these managers used their Tri-Star computers to view the emails in question. As a result, if unrefuted, it eliminates Alfonso's argument that they had the opportunity to know about her meeting with her employment attorney and its purpose.

Alfonso attempts to cast doubt on McAnn's conclusions by pointing to various statements in the deposition of the technology consultant who first loaded Personal Inspector onto the Tri-Star machines. However McAnn's supplemental declaration makes short shrift of these arguments. The technology consultant (Eric Crowl) confirms that problems with anti-virus problems initially prevented Personal Inspector from operating on company computers. E. Cowl Depo., p. 22. But he contends he fixed this problem by adjusting the anti-virus software. *Id*. However, he also admits that he never tested Alfonso's computer to see if the program was operating properly. *Id*, pp. 21, 22. He has no personal knowledge of whether Personal Inspector was ever operational or used on Alfonso's computer, and McAnn's analysis proves the opposite is true. McAnn's testimony also shows the lack of any evidence that Alfonso's emails or password were ever used, viewed, or stored on the computers of Bellinazzo, Peterson, or Ryan.

25 - OPINION AND ORDER

In sum, Alfonso has failed to present evidence sufficient to create a genuine issue of fact that the Personal Inspector program was ever used to gain access to information, on her computer.  As a result, Alfonso's claim is based solely on the inference that can be drawn from the timing between the telephone calls and the terminations.  This one coincidence is insufficient to establish pretext because it provides no evidentiary basis from which to conclude that Bellinazzo, Peterson, or Ryan somehow found out about the meeting (much less the purpose of) Alfonso's meeting with an attorney.

Bellinazzo explained that he telephoned Crowl in order to speak with him about an earlier incident between Crowl and Ryan.  Tri-Star then terminated Crowl after he demonstrated disrespect and insubordination in the meeting called to discuss his recent performance problems. Bellinazzo called in Alfonso after learning that her Outlook calendar listed her as meeting with a competitor in apparent defiance of his earlier instructions not to do so.  Alfonso was terminated after Tri-Star learned from Edera of her attempts to recruit him. Even if Edera was lying, his statements to Bellinazzo provide sufficient evidence of disloyalty to justify firing Alfonso.

By failing to present affirmative evidence to refute McAnn's analysis, Alfonso has failed to show that a genuine issue of fact exists from which a reasonable jury could conclude that her meeting with a labor attorney to discuss ERISA violations by Tri-Star motivated their decision to fire her.  As a result there is no evidence from which to conclude her termination was motivated by her participation in conduct protected by ERISA.  Accordingly, Tri-Star and Bellinazzo are granted summary judgment against the First Claim.

///

///

**II.**    **Oregon Wage Law Retaliation (Second Claim)**

The Second Claim alleges that Tri-Star discharged and discriminated against Alfonso because she made a wage claim or consulted an attorney about a wage claim in violation of ORS 652.355.  To the extent this claim is based upon her efforts to exercise rights protected under ERISA, it is preempted.  *See Felton v. Unisource Corp.*, 940 F2d 503, 507 (9th Cir 1991) (ERISA preemption found where basis of the complaint was that employer discharged employee to avoid paying benefits).  To the extent it rests on some other basis, it fails for the same lack of proof of retaliatory motive from which her ERISA claim suffers.  Accordingly, Tri-Star is granted summary judgment against the Second Claim.

**III.**    **Duty of Good Faith and Fair Dealing (Third Claim)**

The Third Claim alleges that Tri-Star violated its duty of good faith and fair dealing by enforcing the non-compete clause signed by Alfonso in a retaliatory manner.  Alfonso does not explain what she means by a "retaliatory" enforcement of the non-compete clause and has provided no evidence of what opportunities she was denied due to Tri-Star's actions in enforcing the agreement.  Oregon courts have emphasized that "'[t]he obligation of good faith does not vary the substantive terms of the bargain . . . , nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract . . . ."  *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or 638, 645, 891 P2d 639, 643 (1995), quoting *Pac. First Bank v New Morgan Park Corp.*, 319 Or 342, 352, 876 P2d 761, 767 (1994) (alterations in original).  It was Tri-Star's contractual right to enforce its non-compete agreement.  Its motive in doing so is irrelevant.  Thus, Tri-Star is granted summary judgment against the Third Claim.

///

**IV.**    **Invasion of Privacy (Fourth Claim)**

The Fourth Claim alleges that Tri-Star, Bellinazzo and Peterson intruded into her private affairs in three ways:  (1) by using her password to read personal emails from her personal email account; (2) by imitating her for the purposes of terminating an online professional networking account; and (3) by calling the people on her Tri-Star cell-phone contacts list and telling them that she had been terminated and could not speak with them.

Alfonso characterizes her claim as being based on the intrusion upon seclusion theory of the invasion of privacy tort.  *See Mauri v. Smith*, 324 Or 476, 482, 929 P2d 307, 310 (1996) (listing four theories of invasion of privacy tort:  (1) intrusion upon seclusion, (2) appropriation of another's name or likeness, (3) false light, and (4) publication of private facts).  To establish a claim on this theory, a plaintiff must prove:  "(1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a reasonable person."  *Id* at 483, 929 P2d at 310.  Alfonso's claim fails for lack of evidence to prove the first and second elements.

As demonstrated above, Alfonso has failed to create an issue of fact from which a reasonable jury could conclude that anyone at Tri-Star accessed her personal email account.

Alfonso's second allegation is based on a conversation she had with a representative from LinkedIn, an online professional networking site.[8]  Alfonso has not provided any admissible evidence showing why or how this account was terminated.  An officer for Tri-Star has admitted that she called LinkedIn at the request of Peterson to advise that Tri-Star would no longer be paying for the account.  McKay Decl., ¶ 2.  Based on her conversation with the

---

[8]  http://www.linkedin.com/, last accessed April 29, 2009.

representative of LinkedIn, that officer assumes that if LinkedIn cancelled Alfonso's account, it was due to a misunderstanding as she specifically remembers calling only to tell them about the change in billing. *Id.* Alfonso has provided no admissible evidence to refute this explanation.

Finally, Alfonso has provided no evidence from someone with personal knowledge that an employee of Tri-Star represented her employment status to people on her contacts list. In any event this information, if given, was not private or untrue.

Thus, defendants are granted summary judgment against the Fourth Claim.

## **<u>ORDER</u>**

For the reasons state above, defendants' motion for summary judgment is GRANTED, and this case is dismissed with prejudice.

DATED this 4th day of May, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge
